Filed 1/29/14  P. v. Garcia CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOSE CRUZ GARCIA, JR. et al.,<br><br>     Defendants and Appellants. | B244732<br><br>(Los Angeles County<br>Super. Ct. No. BA369694) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Jose Cruz Garcia, Jr.

Gerald Peters, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Daniel Navarro.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury found defendants and appellants Jose Cruz Garcia, Jr. and Jesus Daniel Navarro guilty of attempted murders and found true gun and gang allegations. On appeal, defendants contend that their trials should have been severed and that the evidence is insufficient to support findings that the attempted murders were premeditated, willful, and deliberate. Garcia makes the additional contention that the evidence is insufficient to support his conviction for the attempted murder of Marvin Zelaya.[1] We reject these contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Factual background.**

A.      *October 22, 2007: The attempted murder of Marcos Gonzalez (count 3).*

On October 22, 2007, at about 8:30 p.m., Marcos Gonzalez[2] was with his girlfriend and friend, Ranferi Chamu, on East 42nd Street in Los Angeles when he was shot. According to Officer Oscar Gutierrez, Gonzalez said that a man with very short hair, a thin mustache, and a dark complexion got out from the front passenger seat of a brown four-door Honda Accord. The man yelled, " ' "Where are you from?" ' " Gonzalez said he wasn't from "anywhere," and he didn't "gang bang." Replying, " ' "I think you're from 38th Street," ' " the man pulled a handgun from his sweatshirt and fired six or seven times at Gonzalez, hitting Chamu. The shooter fled in the car, whose driver flashed a "W" hand sign, which Gonzalez recognized as a symbol of the Barrio Mojadas (BMS) gang. The driver had a shaved head and a light complexion.

Less than a year after being shot in 2007, Gonzalez was shot again in June 2008.[3] While investigating that new shooting, Officer Gutierrez interviewed Gonzalez, who

---

[1]     Garcia joins in any argument applicable to him made by Navarro.

[2]     Gonzalez was unavailable to testify at trial. His preliminary hearing testimony was read to the jury.

[3]     There was no suggestion or evidence the two shootings were linked.

admitted he did not tell the detective investigating the October 2007 shooting that he could identify the perpetrators. The interview led Officer Gutierrez to suspect that defendant Garcia was involved in the October 2007 shooting. The officer therefore showed Gonzalez a photographic six-pack with Garcia's photograph in it. He identified Garcia as the driver who flashed a Barrio Mojados gang sign as he drove away with the shooter.

B.      *December 21, 2007: The attempted murder of Miguel Solis (count 2).*

On December 21, 2007, at about 11:00 a.m., Miguel Solis left his house on 51st Street in Los Angeles. A group of people were drinking outside. After he drove away, someone leaned out of the back of a car and said, " 'Fuck Tramps,' " referring to the 38th Street gang. Solis, who denied being a gang member, was shot in the chest but survived.[4] The shooter, who was about 13 feet from Solis, wore a gray hooded sweatshirt and was a male Hispanic. After shooting Solis, the man ran into a pink house with white trim and a wrought iron fence. Solis did not tell officers in the ambulance that the shooter had a tattoo on his neck.

About a month after he got out of the hospital, Solis saw the shooter walk into a store. He also saw him outside a house on 51st Street.

The first time he was shown a photographic six-pack, Solis identified John Nunez as the shooter, but Nunez was in jail on the day Solis was shot. Solis, who was told that Nunez could not be the shooter, then identified Garcia from a photographic six-pack, writing that he remembered the shooter's green eyes and mustache.[5] He was 100 percent positive of his identification. At trial, Solis identified Garcia as the shooter.

---

**4**      One spent .45-caliber casing was found at the scene of the shooting.

**5**      Although Solis's wife witnessed the shooting, she could not make an identification.

C.    *January 31, 2008:  The attempted murder of Marvin Zelaya (count 1).*

On January 31, 2008, at about 7:00 p.m., Carlos Fajardo and Zelaya were in the area of 48th Street and Central Avenue.  Two men came out of an alley and one, from 13 feet away, pointed a gun at Zelaya.  According to Zelaya, the same man asked Zelaya where he was from.  When Zelaya said he wasn't from a gang but a crew, the man said, "Barrio Mojados."  The man, who Zelaya identified at trial as Navarro, shot Zelaya in the chest and hand.[6]  Zelaya told Officer Gutierrez that the nonshooter asked, " 'Who has the rifle?' " and " 'Where are you from?  This is MS Hood.' "  When Zelaya denied any gang affiliation, the nonshooter called him a liar.[7]

Officer Joel Ruiz responded to the shooting.  Zelaya told him that a male Hispanic hit him up and said BMS.  At the hospital, Fajardo told Officer Ruiz that the nonshooter, who he identified at trial as Garcia, punched him and that he wore a white T-shirt and had brown eyes.  Garcia asked, " 'Where are you from?  You bang?' " and " 'Who has the rifle?' "  After Fajardo said he wasn't from a gang, Garcia punched him while the other man pointed a gun at him.  The shooter wore a gray sweatshirt, was 5 feet 10 inches tall, and weighed 185 to 190 pounds.

Zelaya was unable to identify anyone from a book containing "100 or 200" photographs of people from the same gang.  Officer Gutierrez later showed him a photographic six-pack from which he identified the person who shot him, Navarro.  He did not identify Garcia.

Fajardo, however, identified Garcia from a photographic six-pack, stating, " 'It's almost No. 4 because I think he's the one that hit me and he looks real familiar.' "  Fajardo did not identify Navarro from a photographic six-pack.

---

[6]    Three spent .40-caliber casings and one spent round were found at the scene.

[7]    At the preliminary hearing, Zelaya said he didn't get a look at the men's faces although he did see their eyes.  He could not identify the nonshooter at the preliminary hearing.  Zelaya did not see the nonshooter do or say anything to him, but he also said that the nonshooter made motions like he wanted to fight.

4

Months before the shooting, Zelaya saw Navarro on 47th and Central, and he saw him a second time on 46th and Ascot.

At trial, Zelaya identified Navarro as the shooter and Garcia as his companion.[8] Fajardo, at trial, identified Garcia as one of the men who came from the alley.

D.   *The People's gang expert testimony.*

Officer Ruiz, the People's gang expert, was familiar with the Barrio Mojados gang because he arrested members of the gang, took reports from Barrio Mojados crime victims, and talked to members of the gang during consensual encounters. Barrio Mojados also goes by " 'Wet Town' " and " 'Weteros' " and has approximately 150 documented members. The gang's boundaries are Vernon Avenue to the north, 54th Street to the south, Central Avenue to the west, and Compton Avenue to the east. The gang's primary activities range from vandalism, possession of narcotics (marijuana and rock cocaine) for sale, possession of firearms, assault with deadly weapons, robberies, attempted murders, and murders.

When Officer Ruiz was assigned to the gang enforcement detail, the 38th Street gang was one of the gangs he was responsible for. He investigated crimes in which members were suspects and victims. The gang's boundaries are 33rd Street to the north, 48th Place to the south, Alameda to the east, and Central to the west. Gonzalez, one of the victims, is a member of 38th Street. Ruiz knows him personally, and Gonzalez admitted his membership.

In Officer Ruiz's opinion, both defendants are Barrio Mojados members and belong to its clique, 49th Street. Garcia, while in Navarro's company, self-admitted to Los Angeles police officers on February 23, 2008. Garcia also admitted his gang membership to Officer Ruiz. Garcia has tattoos consistent with the gang. Navarro also

---

[8]   At the time of trial, Zelaya was in federal immigration custody. He was aware that someone who cooperates with law enforcement may apply for a U-visa, but at no time before he testified at the preliminary hearing did anyone talk to him about a U-visa or promise him anything in return for his testimony. But it was his understanding that if he cooperated, the prosecutor would sign the U-visa.

has Barrio Mojados tattoos, and he self-admitted to Officer Ruiz's former partners in the gang unit as recently as February 2008.

Using hypotheticals based on the shootings of Solis and Zelaya, it was Officer Ruiz's opinion that the crimes were committed for the benefit of Barrio Mojados.

E.      *The defense eyewitness memory expert.*

Dr. Mitchell Eisen, a psychologist and expert in eyewitness memory, testified that memory is not captured as if on a camera. Rather, people have "attentional capacity," meaning we only take in so much at a time. When memories are retrieved, we use inferences to fill in gaps. Memory, therefore, is "reconstructive," and the most recently remembered version of an event is "how we've decided it happened," even if it includes a mistaken detail.

Trauma and stress can affect memory, limiting dramatically the amount of information people take in and accurately recall. When a traumatic event occurs, people focus on some element of the experience, although the focus varies from person to person. "Weapon focus," for example, occurs when a victim focuses on a weapon, failing to register other details of a crime.

Eyewitness identification can be contaminated in the same sense that physical evidence can be contaminated. "Witness conformity" occurs when witnesses talk to each other and their memories begin to conform to each others' memory of the event. The California Peace Officer's Legal Source book and the United States Department of Justice Guide to Law Enforcement recommend separating witnesses when obtaining identifications.

"Experimentor bias" is the influence, intentional or not, the experimentor might have on the subject. If the experimentor knows the "right" answer, then he or she might influence the outcome. It is therefore recommended that the officer who administers a lineup not know who is the suspect. Also, a pre-lineup admonition is designed to protect against people assuming that the suspect is in the lineup. Without the admonition, people are more likely to treat the lineup like a multiple choice test, meaning, they think the answer must be there.

6

Relative judgment occurs when a witness doesn't recognize anyone immediately but then goes through a longer decision process to decide who is the closest of the group to resemble the perpetrator of the crime. Once people make an identification, they tend to stick with it. Witness confidence is not a good predictor of accuracy.

Memory reports given closer in time to the event tend to be more complete, detailed, and accurate than reports given after extended periods of time. Memory drops off significantly a few days after an event. Also, as time passes, there are more opportunities for exposure to new information that might influence one's memory of the event. Although people do forget to mention details initially, later information, if it is accurate, would be additive, not contradictory. If a witness changes and contradicts their story, it is possible they were exposed to and adopted new information.

Defense counsel asked Dr. Eisen to assume that a witness to a shooting makes no mention, right after the event, of the uniqueness of the assailant's eye color. The police develop a suspect who has green eyes. The witness identifies this suspect and says, for the first time, that he remembers the assailant having green eyes. According to the doctor, it is possible that they are really remembering for the first time the green eyes. It is also possible they incorporated the detail into their memory after being introduced to it.

## II.    Procedural background.

An information filed on December 17, 2010, alleged:  count 1, the premeditated attempted murder of Zelaya by Garcia and Navarro; count 2, the premeditated attempted murder of Marcos Lopez by Garcia and Navarro; count 3, the premeditated attempted murder of Miguel Solis by Garcia; and count 4, the premeditated attempted murder of Marcos Gonzalez by Garcia and Navarro. Count 2 was dismissed and no evidence was introduced at trial concerning the attempted murder of Lopez. Count 3, became count 2 and count 4 became count 3. Gun and gang enhancements were alleged as to each count.

The defendants were tried by a jury after their motion to sever trial was denied.

7

On April 14, 2011, the jury found Garcia guilty of count 1, the attempted murder of Zelaya (Pen. Code, §§ 187, subd. (a), 664)[9] and of count 2, the attempted murder of Solis. The jury found Navarro guilty of count 1. The jury found Garcia and Navarro not guilty of the attempted murder of Gonzalez, count 3.

The jury found that the attempted murders were premeditated, willful, and deliberate. As to count 1, the jury found true principal gun use allegations (§ 12022.53, subds. (d), (e)(1)) against Garcia and personal gun use allegations (*id*., subd. (d)) against Navarro. As to count 2, the jury found true personal gun use allegations (*id.*, subd. (d)) against Garcia. As to both counts and both defendants, the jury found true gang allegations (§ 186.22, subd. (b)(1)(C)).

On October 18, 2012, the trial court sentenced Garcia, on counts 1 and 2, to two life terms plus two 25-years-to-life terms for the gun use enhancements (§ 12022.53, subd. (d)). Navarro was sentenced, on count 1, to life plus 25 years to life (*id*., subd. (d)).

## DISCUSSION

### I. The trial court did not abuse its discretion by denying the motion to sever trial.

Garcia contends that the failure to sever his trial from Navarro's denied him a fair trial and due process of law. We disagree.

The preference for joint trials is a legislative one: "When two or more defendants are jointly charged with any public offense, . . . they must be tried jointly, unless the court order[s] separate trials." (§ 1098.) This preference for joint trials is based on promoting economy and efficiency and serving the interests of justice by avoiding the " ' "scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) Thus, an "accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such

---

[9] All further undesignated statutory references are to the Penal Code.

cases in the same court, the court may order them to be consolidated." (§ 954.) The trial court, however, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts" be tried separately. (*Ibid.*)

The denial of a severance motion is reviewed for an abuse of discretion, judged on the facts as they appeared at the time of the ruling. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 41.) To establish an abuse of discretion, the defendant must make a clear showing of prejudice. (*People v. Thomas* (2012) 53 Cal.4th 771, 798; *People v. Soper* (2009) 45 Cal.4th 759, 773-774.) If the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have received a more favorable result in a separate trial. (*People v. Souza* (2012) 54 Cal.4th 90, 109; *Coffman and Marlow*, at p. 41.) Even if the ruling was correct when made, reversal is required if the defendant shows joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson* (1988) 47 Cal.3d 576, 590, overruled on another ground by *People v. Reyes* (1998) 19 Cal.4th 743, 752-754; *People v. Ervin* (2000) 22 Cal.4th 48, 69.)

The trial court here found that joinder was proper because the crimes were "all identical, committed for all intents and purpose identically." "I do not see any undue prejudice attached to the defendant based upon the fact that there is more than one crime involved; based upon the fact that they are all crimes of the same nature. Based upon the representations that are made by both attorneys . . . , I do not believe that weaker crimes are going to be bootstrapped by stronger offenses, because apparently there are no stronger offenses in this particular case. They all rely upon eyewitness identification. There is no cross-admissibility in any of the cases."

Garcia concedes that joinder was proper because the charged crimes were of the "same class," namely, premeditated attempted murder. He nonetheless argues that the "interests of justice" and "for good cause shown" the severance motion should have been granted. (§ 954.) To determine whether the trial court abused its discretion, we first consider whether evidence underlying the charges would be cross-admissible, because cross-admissibility of evidence is normally sufficient to dispel any suggestion of

9

prejudice. (*People v. Soper, supra,* 45 Cal.4th at pp. 774-775.) If, however, the evidence would not be cross-admissible, we next consider " 'whether the benefits of [the] joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that* assessment, we consider . . . : (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Id.* at p. 775.)

As to cross-admissibility, the trial court found that there was no cross-admissible evidence. We do not, however, agree with the trial court on this point. The gang evidence was cross-admissible. The People's theory was that each of the original four counts of attempted murder were committed by Garcia and/or Navarro, members of the Barrio Mojados gang, against people who were members of a rival gang (38th Street) or who defendants thought were rival gang members. Officer Ruiz supported this theory by testifying, for example, about Barrio Mojados's territory, 38th Street's territory, and that Gonzalez (the victim in count 3) was a member of 38th Street. This evidence was relevant to defendants' motive for the crimes; hence, it was relevant to the issue of premeditation, deliberation and willfulness.[10]

But even if we assume, as did the trial court, that there was no cross-admissible evidence, the remaining factors relevant to severance do not establish an abuse of discretion. None of the three charges on which the defendants were ultimately tried were likely to inflame the jury. Rather, they were all "similar in nature and equally egregious." (*People v. Soper,* 45 Cal.4th at p. 780.) Each involved brief encounters during which the assailants issued a gang challenge before shooting the victim.

---

**10** We discuss this issue in Section III of the Discussion, *post*.

10

Nor was a weak case joined with a strong case so that the totality of the evidence altered the outcome as to some or all of the charges. All three counts depended on eyewitness identification testimony. No physical evidence linked defendants to any of the crimes. The victim in count 3, Gonzalez, was unavailable to testify and therefore his preliminary hearing testimony was read to the jury.[11] To the extent this made count 3 "weaker"—and it clearly was in that the jury found defendants not guilty of the crime—a "mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*People v. Soper, supra,* 45 Cal.4th at p. 781.)

The final factor, whether one of the charges was a capital offense, does not apply.

Although these factors demonstrate that the trial court did not abuse its discretion, defendants cite *Williams v. Superior Court* (1984) 36 Cal.3d 441. *Williams* concerned severance of murder charges arising out of two separate but apparently gang-related incidents which occurred about nine months apart. In considering the prejudicial effect of joining the charges, the court found that the evidence of gang membership, "the sole distinctive factor allegedly common to each incident" might have a prejudicial, if not inflammatory, effect on a jury in a joint trial: "The implication that gangs were involved and the allegation that petitioner is a gang member might very well lead a jury to cumulate the evidence and conclude that petitioner must have participated in some way in the murders or, alternatively, that involvement in one shooting necessarily implies involvement in the other. . . . In addition, . . . it might be the highly publicized phenomenon of gang warfare in Southern California which would be on trial as much as the defendant, thereby raising the spectre of prejudice far beyond the facts of the actual case." (*Id.* at p. 453.) The court also cautioned against joinder if there was a danger the jury would aggregate the evidence, "though presented separately in relation to each charge, and convict on both charges in a joint trial." (*Ibid.*)

---

[11] The jury found defendants not guilty of this count.

Although *Williams* was critical of using gang evidence to support joinder, what also concerned the *Williams* court was that one of the charged crimes was a capital offense, joined with a noncapital one—a concern that is not present in our case. (*Williams v. Superior Court, supra,* 36 Cal.3d at p. 454.) Moreover, the gang evidence here was limited and specific. It showed, for example, that defendants Garcia and Navarro belonged to Barrio Mojados; that a reference to Barrio Mojados was made before Zelaya was shot; and that "Fuck Tramps" (something a Barrio Mojados gang member might say in derogation to 38th Street gang) was yelled before Solis was shot. The gang evidence therefore connected defendants to the crimes and to each other.

For the same reasons on which we base our conclusion the trial court did not abuse its discretion in denying the severance motion, we also conclude that the denial of severance did not result in actual unfairness so that it denied defendants due process or the right to a fair trial, a showing requiring defendants to meet a "high burden." (*People v. Soper*, *supra,* 45 Cal.4th at pp. 783-784.) The evidence underlying each incident was straightforward and distinct. (*Id.* at p. 784.) The evidence of each incident was also independently sufficient to support defendants' conviction of the charged crimes. And, as we discussed above, there was no disparity in the nature of the three charges at issue during trial. Nor was there a great disparity in the strength of the evidence supporting each offense, which depended primarily on eyewitness identification. The facts of each crime, compared to the others, were not likely to inflame the jury unduly. Indeed, the jury's finding defendants not guilty of the attempted murder of Gonzalez suggests that it was capable of differentiating between defendants' various attempted murders. (*Ibid*.)

We therefore conclude that defendants have failed to demonstrate that their trial was grossly unfair or the level of prejudice required to demonstrate error in a trial court's denial of a motion to sever properly joined charges. (*People v. Soper, supra*, 45 Cal.4th at p. 784.)

12

**II.    Sufficient evidence supports the conviction for the attempted murder of Zelaya.**

Garcia contends there is insufficient evidence to support his conviction for the attempted murder of Zelaya as an aider and abettor.  We disagree.

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; see also *People v. Carrington* (2009) 47 Cal.4th 145, 186-187.)  We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  The same standard applies when the conviction is based primarily upon circumstantial evidence.  (*Zamudio*, at p. 357; *People v. Valdez* (2004) 32 Cal.4th 73, 104.)

A person who aids and abets the commission of a crime is a principal in the crime.  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Lisea* (2013) 213 Cal.App.4th 408, 414; § 31.)  "[P]roof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.  [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Among the factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene, companionship, and conduct before and after the offense, including flight.  (*In re Juan G.* (2003) 112

Cal.App.4th 1, 5.) But mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

The evidence here shows that Garcia was more than merely "present" with Navarro at the shooting of Zelaya. Garcia and Navarro were members of the same gang, Barrio Mojados. Although membership in a common gang by itself would be insufficient to establish aider and abettor liability, such common gang membership can be relevant to intent and motive in aiding and abetting a crime. (*People v. Garcia, supra,* 168 Cal.App.4th at pp. 277-278; but see *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342, overruled on another ground by *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248.)[12] In *Garcia,* the aider and abettor and direct perpetrator were cofounding members of the same gang. (*Garcia,* at pp. 268, 277.) Gang evidence was introduced to show that they "undertook to 'elevate' the status" of their gang and that gang members will support fellow gang members during crimes. (*Id.* at pp. 277-278.) Similarly here, Garcia and Navarro were members of Barrio Mojados. Not only was there evidence that they committed the crime against Zelaya, but there was evidence they had previously tried to kill Gonzalez, the victim in count 3. Evidence of their partnership in more than

---

[12]    *Mitchell* said: "Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting. To hold otherwise would invite absurd results. Any gang member could be held liable for any other gang member's act at any time so long as the act was predicated on the 'common purpose of "fighting the enemy." ' [Citation.]" (107 F.3d at p. 1342.)

We are not bound by the decisions of lower federal courts. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3, overruled on another ground *People v. Yeoman* (2003) 31 Cal.4th 93.)

one criminal act committed at different times against different people tended to show that Garcia was knowingly aiding and abetting Navarro to benefit or further their gang.

Aside from their membership in a common gang, the bare facts of the crime against Zelaya establish that Garcia aided and abetted Navarro in the attempted murder. Garcia and Navarro emerged from the alley together. At least one of them issued a gang challenge (Zelaya testified that Navarro asked where he was from, and Fajardo said that Garcia asked where he was from). Garcia did not passively look on as Navarro shot Zelaya. Rather, Garcia assisted Navarro by asking, " 'Who has the rifle?' " This question suggests knowledge that what was occurring was not a peaceful confrontation but one fraught with the potential for violence. (See, e.g., *People v. Garcia, supra,* 168 Cal.App.4th at p. 274 [aider and abettor who "did most of the talking in the confrontation leading to the shooting" thereby "encouraged" the shooting].) Garcia then hit Fajardo while Navarro pointed a gun at the victims. Afraid that Navarro would shoot him, Fajardo did not hit Garcia but instead fled into a store.

This evidence is more than sufficient to show that Garcia aided and abetted a coordinated attack on Zelaya and Fajardo, with the knowledge that Navarro had a gun and would use it.

## III.    Sufficient evidence supports the premeditation finding.

Both defendants contend there is insufficient evidence to support the findings that the attempted murders of Zelaya and Solis were premeditated, willful, and deliberate. Again, we disagree.[13]

A murder that is premeditated and deliberate is murder of the first degree. (§ 189; *People v. Burney* (2009) 47 Cal.4th 203, 235.) Premeditation and deliberation requires more than a showing of intent to kill. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and

---

[13]    The same standard of review stated above applies to the determination whether the evidence was sufficient to sustain a finding that the attempted murders were premeditated, willful, and deliberate.

15

reflection, rather than as the product of an unconsidered or rash impulse. (*Burney*, at p. 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

A reviewing court normally considers three types of evidence when determining whether a finding of premeditation and deliberation is adequately supported: planning activity by the defendant; motive; and the manner of killing. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664; *People v. Burney*, *supra,* 47 Cal.App.4th at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*Romero*, at p. 401.) These factors are not the exclusive means to establish premeditation and deliberation and need not be present in any particular combination, or at all, to establish the evidence was sufficient. (*Gonzalez*, at p. 663; *Burney*, at p. 235; *People v. Tafoya* (2007) 42 Cal.4th 147, 172; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127.)

As to the attempted murder of Zelaya, evidence of planning activity and motive and the manner of the attempted killing support the premeditation finding. As we discussed, Navarro and Garcia were members of the same gang, Barrio Mojados. Together, they exited an alley and confronted Zelaya and Fajardo. Navarro was armed with a gun, suggesting he was prepared and planned for a violent confrontation. (*People v. Lee* (2011) 51 Cal.4th 620, 636 [the defendant's possession of a loaded gun on the night of the murder indicates he "considered the possibility of a violent encounter"].) Navarro pointed the gun at the victims while Garcia asked whether they were armed.

Either Navarro or Garcia or both asked the victims where they were from. This gang challenge establishes a motive for the crime; hence it, too, is evidence of premeditation. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 849 ["Premeditation can

16

be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief"].) In *Sanchez,* for example, the victim (an innocent bystander) was killed during a drive-by shooting which was preceded by gang challenges issued by the defendant and the intended victim. Here, Navarro and Garcia may have "happened upon" the victims, but the randomness of the meeting does not necessarily negate premeditation. Where, as here, the shooting took place in the context of a gang confrontation, a cold and calculated judgment to kill someone perceived to be a rival gang member may be arrived at in moments.

The manner in which the attempted murder took place also shows premeditation. The shooting was unprovoked. Zelaya and Fajardo were just walking when defendants confronted them. Even after they were provoked with the gang challenge, neither Zelaya nor Fajardo said they were in a gang or otherwise acted provocatively. "The utter lack of provocation by the victim is a strong factor supporting the conclusion that appellant's attack was deliberately and reflectively conceived in advance. [Citations.]" (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.) Navarro also shot Zelaya in the chest and hand while standing approximately 13 feet from him. "The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' [Citation.] 'The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.' [Citation.]" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) A reasonable juror could have concluded that the unprovoked and close-range shooting was done in a manner suggesting a preconceived design to kill.

As to Solis, he was similarly shot without provocation. He was driving when he heard a gang challenge, "Fuck Tramps." This shows that the shooter thought that Solis was a member of the 38th Street gang, thus providing a motive for the attempted murder.

17

(See *People v. Sanchez, supra*, 26 Cal.4th at p. 849.) Solis was also shot at relatively close range. He estimated that the shooter was just 13 feet from him.

Defendants characterize this evidence as showing nothing more than rash, spontaneous shootings. Defendants just happened upon the victims, they argue. That, however, was one view of the evidence. Another reasonable view was that they saw Zelaya and Fajardo and deliberately set upon them after emerging from the alley. Similarly, Solis was in his car when he was shot. Premeditation and deliberation may occur over a very short period of time. There was certainly time for such thought to occur between the time defendants issued gang challenges to the victims and the time the victims gave an unsatisfactory response or, in Solis's case, no response at all.

Defendants also decry the use of gang evidence to show support premeditation. Both shooting incidents, as well as the Gonzalez attempted murder of which defendants were found not guilty, were connected by Officer Ruiz, the gang expert. He explained that 38th Street was a rival of defendants' gang, Barrio Mojados. All three incidents involved gang challenges. Zelaya was asked where he was from before being shot; "Fuck Tramps" was shouted before Solis was shot; and Gonzalez was accused of being from 38th Street before he was shot, and a "W" (a hand sign associated with Barrio Mojados) was thrown after he was shot. This evidence, coupled with the gang expert's testimony, gave rise to a reasonable inference that these Barrio Mojados gang members were actively looking for and deliberately engaging in violent confrontations with people who were or who they perceived to be members of a rival gang. "A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation." (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001.)

We therefore conclude that sufficient evidence supports the premeditation findings.

18

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


KITCHING, J.